UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

           Plaintiff,                              Case No. 1:08-cr-68

v.                                         HON. JANET T. NEFF

RAOGO OUEDRAOGO,

           Defendant.

_____/

## OPINION

Defendant Raogo Ouedraogo and his co-defendant Rami Saba were charged in a twelve-count Third Superseding Indictment with conspiracy to commit bank fraud, conspiracy to commit interstate murder-for-hire, conspiracy to commit kidnapping, kidnapping resulting in death, four counts of attempted financial institution fraud (bank fraud) and four counts of aggravated identity theft, related to the disappearance and presumed death of Donald Dietz—a retired, single man who lived a meager, reclusive life in rural Saranac, Michigan but who had amassed a nearly one-half million dollar retirement savings account.

Defendants' cases were severed for purposes of trial, and shortly before trial, the government dismissed the eight counts of attempted financial institution fraud and aggravated identity theft as to Ouedraogo.  Ouedraogo was tried first, over the course of four weeks in March 2011.  Saba's trial followed over the course of five weeks in May and June 2011, with the presentation of the almost identical case.  Although there was no dispute that Dietz was dead, no body had been found, and there was no crime scene, no murder weapon or direct evidence linking Ouedraogo to Dietz'

disappearance or murder.  The government's case was based purely on circumstantial evidence, most of which pointed to Saba, and very little of which implicated Ouedraogo.

At trial, the government painted a picture of Dietz as the perfect mark, an unusual, "kind of a strange guy," who lived alone, in an isolated trailer, in a secluded area in the middle of nowhere (Tr. 197, 2842-43).  He was 66 years old in September 2007, unmarried and never had had a girlfriend; he had few friends and was a recluse to even his own family (Tr. 197, 2843).  He had a lot of money and would not be easily missed (Tr. 219, 2843, 2864).  So Saba thought he had the perfect mark, but he needed somebody to help him pull off what he thought was the perfect plan (Tr. 2843, 2861).  Saba turned to Ouedraogo for help with the plan (Tr. 2845).  The government acknowledged that Saba was the central figure in the scheme to kidnap and kill Dietz and steal his money and that so much of the government's case was about Saba that the jury probably wondered at times who was on trial (Tr. 2840).  Nonetheless, it was the government's ultimate contention that Ouedraogo knowingly and voluntarily agreed to help Saba execute his scheme and helped his friend commit the crime, despite presenting evidence of only Saba's wrongdoing.

After the government rested its case, and again after the defense rested, Ouedraogo moved for judgment of acquittal on all counts.  The Court denied the motions.  The jury returned a verdict of guilty on three counts:  conspiracy to commit bank fraud, conspiracy to commit kidnapping, and kidnapping resulting in death, but acquitted Ouedraogo of conspiracy to commit interstate murder-for-hire.  Ouedraogo now moves to set aside the guilty verdicts and for entry of a judgment of acquittal or, alternatively, for a new trial.

# I.  LEGAL STANDARDS

## A.  Rule 29 Motion

The standard for reviewing a request for judgment of acquittal, post trial, is well established: "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319 (1979) (emphasis in original); *see also United States v. Sliwo,* 620 F.3d 630, 633 (6th Cir. 2010); *United States v. Ward,* 190 F.3d 483, 487 (6th Cir. 1999).  "[T]he court draws 'all available inferences and resolve[s] all issues of credibility in favor of the jury's verdict.'"  *United States v. Alvarez,* 266 F.3d 587, 596 (6th Cir. 2001) (quoting *United States v. Salgado,* 250 F.3d 438, 446 (6th Cir. 2001)).  "This standard is a great obstacle to overcome" for a criminal defendant.  *United States v. Hughes,* 505 F.3d 578, 592 (6th Cir. 2007) (citing *United States v. Winkle,* 477 F.3d 407, 413 (6th Cir. 2007)).

Under this standard, the court must not "re-weigh the evidence, re-evaluate the credibility of witnesses, or substitute its judgment for that of the jury."  *United States v. Johnson,* 2011 WL 4585234, at *4 (6th Cir. 2011); *see also United States v. Welch,* 97 F.3d 142, 148, 151 (6th Cir. 1996).  The government "may 'meet its burden through circumstantial evidence alone, and such evidence need not exclude every possible hypothesis except that of guilt.'"  *Alvarez,* 266 F.3d at 596 (quoting *Salgado,* 250 F.3d at 446).

However there are times when circumstantial evidence "amounts to only a reasonable speculation and not to sufficient evidence."  *Newman v. Metrish,* 543 F.3d 793, 796 (6th Cir. 2008) (citing cases).  The Court when reviewing the sufficiency of the evidence is limited to allowing only reasonable inferences to be drawn.  *Id.* at 796-97.  It is improper for a jury to have piled "inference

3

upon inference" in reaching the conclusion that circumstantial evidence provided evidence of guilt of a conspiracy. *Direct Sales Co. v. United States,* 319 U.S. 703, 711 (1943); *United States v. Goyal,* 629 F.3d 912, 915-16 (9th Cir. 2010) (reversing the defendants' convictions for securities fraud because the government's proof on materiality was lacking and a jury finding for the government would have been based on mere speculation rather than reasonable inference); *United States v. White,* 932 F.2d 588, 590 (6th Cir. 1991) (holding that "a line must be drawn between valid circumstantial evidence, and evidence which requires a leap of faith in order to support a conviction"). The government must show more than "closely coordinated activity" for a conspiracy conviction and must prove knowledge and intent beyond a reasonable doubt. *Sliwo,* 620 F.3d at 633, 635.

### B.  Motion for New Trial

Defendant alternatively seeks a new trial pursuant to Federal Rule of Criminal Procedure 33(a), which provides, in pertinent part, that "the court may vacate any judgment and grant a new trial if the interest of justice so requires." A new trial motion may be premised on an argument that the jury's verdict was against the manifest weight of the evidence. *Hughes,* 505 F.3d at 592. The decision whether to grant a new trial rests within the court's discretion. *Id.* at 593; *United States v. Davis,* 15 F.3d 526, 531 (6th Cir. 1994). "A district judge, in considering the weight of the evidence for purposes of adjudicating a motion for new trial, may act as a thirteenth juror, assessing the credibility of witnesses and the weight of the evidence." *Hughes,* 505 F.3d at 593. But the motion should be "granted only 'in the extraordinary circumstance where the evidence preponderates heavily against the verdict.'" *Id.* (citation omitted). The court "'can consider the credibility of

witnesses and the weight of the evidence to insure that there is not a miscarriage of justice.'" *United States v. Ashworth*, 836 F.2d 260, 266 (6th Cir. 1988) (citation omitted).

The Court can also consider granting a new trial for any other reason if justice so requires, such as evidentiary errors during trial. *United States v. Hall,* 2010 WL 1417871, at *7 (E.D. Tenn. Apr. 6, 2010) (considering evidentiary errors for a new trial motion under Rule 33); *see United States v. Brown,* 2011 WL 1004552, at *2 (N.D. Ill. Mar. 17, 2011) (noting that "[t]he Seventh Circuit has indicated that a motion for a new trial may be granted if there was insufficient evidence to support a conviction or if there were errors in evidentiary rulings ....").

A motion for a new trial may also be granted on the grounds of prosecutorial misconduct. *United States v. Hargrove,* 416 F.3d 486, 493 (6th Cir. 2005).  If the remarks tended to be misleading or prejudicial, were extensive, were deliberate and there was not overwhelming evidence of the defendant's guilt, the misconduct is flagrant and is *per se* reversible error. *Id.*  The Sixth Circuit Court of Appeals has set forth the approach to claims of prosecutorial misconduct as follows:

> "First, we determine whether a prosecutor's remarks were improper, and then we determine whether the impropriety amounts to reversible error." *United States v. Carroll,* 26 F.3d 1380, 1385 (6th Cir. 1994). There are two types of reversible error in this area: improper remarks that are flagrant amount to *per se* reversible error; improper remarks that are not flagrant may amount to reversible error in certain circumstances. This Court determines whether improper remarks were flagrant by considering four factors: "(1) whether the remarks tended to mislead the jury or to prejudice the accused; (2) whether they were isolated or extensive; (3) whether they were deliberately or accidentally placed before the jury; and (4) the strength of the evidence against the accused." *Id.*; *see also United States v. Trujillo,* 376 F.3d 593, 613 (6th Cir. 2004); *United States v. Carter,* 236 F.3d 777, 783 (6th Cir. 2001). If a remark is held to be not flagrant, it may nevertheless warrant reversal in cases where (1) the proof against the defendant was not overwhelming, (2) opposing counsel objected to the conduct, and (3) the district court failed to give a curative instruction. *Carroll,* 26 F.3d at 1385; *Trujillo,* 376 F.3d at 613; *see also United States v. Galloway,* 316 F.3d 624, 633 (6th Cir. 2003).

*Hargrove,* 416 F.3d at 492-93.

5

The burden of proving that a new trial should be granted is on the defendant. *Davis,* 15 F.3d at 531.

## II.  NATURE OF THE CASE

The government's case against Saba and Ouedraogo began as a missing-person investigation on September 25, 2007, and evolved backwards into a conspiracy theory that Saba and Ouedraogo, both from foreign countries and both trained post-doctoral medical researchers/scientists, master-minded, but bumbled, a plan to steal Dietz' more-than-$400,000 retirement savings, ultimately, kidnapping and killing him, perhaps inadvertently, and disposing of his body without a trace of physical evidence or any indication of a crime scene.  The indictment charged that the principal object of the conspiracy was to kidnap and incapacitate Dietz, coerce him into transferring his money to an account under the control of one or more of the defendants, and assume his identity to illegally obtain money and funds from various financial institutions, including $443,606.40 then on deposit with the Lake Michigan Credit Union (LMCU) in Grand Rapids, Michigan and $11,472.41 on deposit with the Capital One Bank ("Capital One") in Glen Allen, Virginia (Dkt 179 at 5).

Although there was fairly clear evidence linking Saba to Dietz and an attempt to impersonate Dietz and fraudulently drain his financial accounts in the days following his presumed death, the government's case against Ouedraogo was based entirely on Ouedraogo's friendship and association with Saba, primarily their telephone call records and travel in 2007, which the government alleged increased significantly from past years.  The record was devoid of evidence of any link between Ouedraogo and Dietz, either directly or indirectly through Saba.

## A.  The Defendants

Ouedraogo was born in Burkina Faso, West Africa, but had lived in the United States since 2001.  Ouedraogo spent several years studying in Belgium, where he and Saba met as students, becoming close friends.  In 2007, Ouedraogo lived with his wife and two children in Philadelphia, Pennsylvania, where he was employed in a post-doctorate program doing medical research at Thomas Jefferson University.

Saba, a Lebanese national, lived in Lowell, Michigan, a neighboring community to Saranac, where Dietz lived.  In 2006 and 2007, Saba lived with his wife and two children, the second of which was born in September 2007.  Saba worked as a financial services representative, having had a less-than-successful career as a medical researcher and his research position at Michigan State University (MSU) having ended in June 2006.

## B.  Saba and Dietz

The evidence was undisputed that Saba had connections to Dietz beginning in 2006 in an effort to persuade Dietz to invest his money with Banker's Life and Casualty, where Saba was employed, and later with New York Life Insurance Company, where Saba was employed after he was fired from Banker's Life.  Saba had visited Dietz at his home and had made repeated follow-up calls to Dietz in an unsuccessful effort to get Dietz to invest his money through Saba.

When Dietz came up missing in September 2007, investigators discovered his link to Saba by a serendipitous connection between a 2006 Christmas card found at Dietz's trailer, with Saba's home address on Bowes Road in Lowell, and cellular telephone records of a call made in the area of the "Bowes Road" cell tower, prompting an investigation of Saba.  Based on evidence linking

7

Saba to fraudulent financial activity involving Dietz' accounts, the government filed a Criminal Complaint against Saba on December 12, 2007 (Dkt 1), and the following day, on December 13, 2007, Saba was arrested on suspected charges of mail fraud, financial institution fraud, and aggravated identity theft, 18 U.S.C. §§ 1341, 1344 and 1028A.

### C.  The Government's Evolving Criminal Charges

The Criminal Complaint set forth evidence of fraudulent activity related to Dietz' financial accounts, including a September 19, 2007 typed request to Lake Michigan Credit Union to close Dietz' $443,606 money market account and have the funds wire-transferred to Blom Bank in Beirut, Lebanon, although, according to the Complaint, at that time Dietz was already missing (*see* Dkt 1, ¶ 23).  Similar suspect activity had occurred with the Bank of America:  two checks were negotiated on Dietz' account, a $2,700 check dated September 17, 2007, deposited into Saba's MSU Credit Union account, but returned because the Bank of America account was not opened until September 26, 2007; and a check for $9,300 dated September 16, 2007, made payable from Donald Dietz to Donald Dietz, but negotiated by Saba on October 1, 2007 for deposit in Saba's MSU Credit Union account.

Other evidence in the Criminal Complaint included phone calls implicating Saba in fraudulent efforts to obtain Dietz' money.  On September 30, 2007, Dietz' brother, Gene Dietz, received a call from an unknown caller at (616) 724-6765, who had a fantastical tale to tell.  The caller had a heavy foreign accent and identified himself as Donald Dietz, claiming he needed access to his money in the Lake Michigan Credit Union account because he had gotten a girl pregnant and was traveling to Greece with her.  This tale was beyond incredulous to Gene Dietz, who was well

aware of his brother's shyness and that Donald Dietz had never had any known relationship with a woman.

The caller explained his accent by saying he was very stressed over finding out he had a child and had a stroke, but the caller abruptly hung up when Gene Dietz asked him their mother's middle name. Cell phone records also showed calls were made to Capital One, Bank of America, and Lake Michigan Credit Union from a Tracfone with that same phone number, (616) 724-6765, purchased from a Grand Rapids Staples Office Supply store on September 18, 2007 and activated on that date, and the location of the Tracfone at the time of the calls coincided with the location of cell phones belonging to Saba. Additionally, forensic analysis of computer-generated documents obtained from Saba showed that they were consistent with the letter sent to Lake Michigan Credit Union to transfer Dietz' funds to Lebanon.

On March 12, 2008, the government filed a two-count Indictment charging Saba with financial institution fraud and aggravated identity theft related to the fraudulent scheme to obtain Dietz' $443,606 on deposit at the Lake Michigan Credit Union (Dkt 28). On June 12, 2008, the Government filed a Superseding Indictment elaborating on the factual allegations of fraud involving Dietz' bank or credit card accounts, and adding three counts each of financial institution fraud and aggravated identity theft related to three additional institutions: Bank of America, Capital One Bank, and Washington Mutual Bank (Dkt 39).

The Superseding Indictment against Saba further detailed the evidence implicating him in fraudulent activity concerning Dietz' financial accounts and disappearance. The government alleged that attempts by family members to contact or locate Dietz had been unsuccessful since September 13, 2007 (Super. Indict. ¶ 3), and that Saba was directly involved in efforts to steal Dietz' identity

and obtain his money as follows.  In or before August 2006, Saba contacted Dietz as a prospective

client while employed by Banker's Life and Casualty, obtaining specific personal information about

Dietz, including that Dietz had amassed $300,000 in savings (*see id.* ¶¶ 4, 6).  Further, in September

2006, Saba became employed by New York Life Insurance Company as a "Financial Services

Professional," and Saba continued contact with Dietz, visiting him at his home at least twice to

prepare an investment proposal (*id.* ¶ 7).  The Superseding Indictment detailed Saba's role in

fraudulent activities to obtain Dietz' money related to the four financial institutions previously

identified: Lake Michigan Credit Union, Bank of America, Capital One Bank, and Washington

Mutual Bank.  The government specifically alleged that Saba forged Dietz' signature on a

September 19, 2007 letter to Lake Michigan Credit Union, requesting that Dietz' entire account be

closed and the $443,606.40 be sent to Blom Bank in Beruit, Lebanon (*id.* ¶ 11).

Although the government had set forth specific activities to support the eight pending

charges against Saba in successive indictments, Ouedraogo was not a part of this case until January

27, 2009, with the filing of a Second Superseding Indictment—more than a year after the Criminal

Complaint was filed against Saba (Dkt 82).  The Second Superseding Indictment added a count of

Conspiracy to Commit Financial Institution Fraud, based on the same previously alleged fraudulent

financial activities and aggravated identity theft allegations against Saba, and Ouedraogo's alleged

complicit role based on the government's allegations that (1) Ouedraogo was experiencing

significant stress during 2007 because of his poor financial situation (Sec. Super. Indict. ¶ 8); (2) he

and Saba were longstanding friends, dating back to the mid-to-late 1990s when they attended school

together in Belgium (*id.* ¶ 9); (3) during 2007, Ouedraogo made at least three trips to Grand Rapids,

including a 48-hour trip during the time Dietz was believed to have disappeared, September 11-13

(*id.*); (4) Ouedraogo could not account for his whereabouts from 11:23 p.m. when he arrived on September 11 to 1:45 p.m. the next day and gave conflicting accounts of his activities to investigators (*id.*); (4) Ouedraogo and Saba both lied to their respective spouses about their whereabouts and activities those days (*id.*); (5) throughout the conspiracy, Saba maintained telephone contact with Ouedraogo by cellular phone, using two different phone numbers, one of which was a number issued to Saba but for which he had given the "SIM" card to Ouedraogo (*id.* ¶ 13); and (6) telephone contact records showed that Saba consulted with Ouedraogo "proximately before and after most of his contacts with the various financial institutions …." (*id.*).

The Second Superseding Indictment set forth 24 overt acts related to the Conspiracy to Commit Financial Institution Fraud (Dkt 82 at 7). Almost without exception, the substantive conduct relating to the financial fraud and identity theft set forth in the overt acts was undertaken by Saba, not Ouedraogo.[1] The references to Ouedraogo consisted of (1) traveling from Philadelphia to Grand Rapids for visits with Saba on July 22-August 1, 2007, August 15-18, 2007, and September 11-13, 2007, and (2) numerous telephone calls with Saba on the days of the alleged financial fraud-, identity theft- and presumed kidnapping-related activities undertaken by Saba, including some calls that were made with a "SIM" card for a telephone number issued to Saba by AT & T, despite the fact that Ouedraogo had his own operable cell phone. Thus, the charges against Ouedraogo were based, at most, on his presence in Grand Rapids and association with Saba at suspect times.

---

[1]Although the government alleged in overt act 4 that "[o]n August 17, 2007, Defendants Saba and Ouedraogo ordered, through the Internet using Defendant Saba's Yahoo account, a 'stun gun' from Stun Gun Supply in Lebanon, Pennsylvania," that allegation was subsequently modified to delete any reference to Ouedraogo's direct participation in ordering the stun gun (*see* Third Super. Indict., Overt Act 7).

In August of 2009, the government returned to the grand jury, seeking another superseding indictment with additional charges against both Saba and Ouedraogo based on the suspected/presumed kidnapping and murder of Dietz.  On September 24, 2009, the government filed a Third Superseding Indictment, adding two capital offenses against both Saba and Ouedraogo: Conspiracy to Commit Interstate Murder-for-Hire and Kidnapping Resulting in Death, potentially subjecting both defendants to the death penalty for the alleged kidnapping and death of Donald Dietz.[2]

Based on an ever-evolving conspiracy theory, the government ultimately alleged that Saba and Ouedraogo planned to kidnap and murder Dietz, and did murder him, and agreed to defraud four financial institutions in trying to obtain Dietz' assets.  Although the government originally indicted Ouedraogo on all the same charges pending against Saba, shortly before the March 2011 trial, the government dismissed all eight substantive financial fraud and aggravated identity theft charges against Ouedraogo.  Ouedraogo was tried on only four charges:

| Count | Offense |
|-------|---------|
| 1 | Conspiracy to Commit Financial Institution Fraud |
| 2 | Conspiracy to Commit Interstate Murder-for-Hire |
| 3 | Conspiracy to Commit Kidnapping |
| 4 | Kidnapping Resulting in Death |

The jury acquitted Ouedraogo of the Conspiracy to Commit Interstate Murder-for-Hire charge, and found him guilty of the remaining three charges.

---

[2]Following an extensive death penalty certification process, in August 2010, certification was denied by the United States Attorney General, and on August 25, 2010, the Government filed a notice of its intent to not seek the death penalty (Dkt 318).

### III.  MOTION FOR JUDGMENT OF ACQUITTAL

It was the government's theory that Dietz died on September 12 or September 13, 2007, while Ouedraogo was in Grand Rapids on a visit, even though Dietz' family did not report him missing until September 25.[3]  Ouedraogo moves for a judgment of acquittal on the grounds that the evidence was insufficient to support the convictions because impermissible inferences had to be drawn for the jury to have found that a kidnapping and resulting death occurred on September 12 or 13 and that Ouedraogo was involved in it.

#### A.  The Proofs at Trial

The government's case submitted to the jury against Ouedraogo was a self-described "mosaic of all the proofs" (Oral Argument, 11/9/11 Mot. Hrg.)  The proofs at Ouedraogo's trial consisted of hundreds of exhibits, and days of testimony from witnesses, to add evidentiary detail to the government's conspiracy theory of Dietz' kidnapping and death.

The government proofs, however, were all about Saba.  Proofs at Ouedraogo's trial showed that Saba concocted a scheme with the intent to defraud, which included material misrepresentations, and that Saba committed overt acts to carry out the scheme.  As the government sought to develop a theory to fit the facts, it employed ruthless repetition of unconnected facts in the effort to persuade the jury of Ouedraogo's participation.  Lost in the morass of data produced by the government was any semblance of a coherent or comprehensive attempt to simply establish the elements of the offenses charged as to Ouedraogo.

---

[3]More specifically, the government argued to the jury that Dietz was likely killed in a four-hour period between 9:43 a.m. and 1:47 p.m. on September 12 (*see* Tr. 223, 2890).

13

For the jury to find Ouedraogo guilty of the conspiracy charges, the government had to prove beyond a reasonable doubt:

First, that Ouedraogo conspired, or agreed, with Saba to commit the particular offense alleged in the indictment.  For Count 1, that offense was financial institution fraud and for Count 3, that offense was kidnapping (*see* Tr. 2807).

Second, that Ouedraogo knowingly and voluntarily joined the charged conspiracy, and acted with the same intent required to commit the particular offense alleged.

And third, that either Ouedraogo or Saba did one of the overt acts described in the indictment for the purpose of advancing or helping that particular conspiracy.

The elements of financial institution fraud are (*see* Tr. 2823):

(1)     The defendant knowingly executed or attempted to execute a scheme to obtain money or other property owned by or in the control of a financial institution by means of false or fraudulent pretenses, representations or promises;

(2)     The scheme included a material misrepresentation or concealment of a material fact;

(3)     The defendant had the intent to defraud; and,

(4)     The financial institution was federally insured (This element is not in dispute.).

The elements of kidnapping are (*see* Tr. 2827):

(1)     The defendant knowingly and willfully kidnapped, abducted, seized or confined another person;

(2)     The defendant thereafter held that person for ransom, reward or other benefit;

(3)     And the defendant, in furtherance of the kidnapping, traveled in interstate commerce or willfully used an instrumentality of commerce.

14

For a conviction of kidnapping resulting in death, the government was required to prove beyond a reasonable doubt that the kidnapping resulted in the death of Donald Dietz. That is, that the death was proximately or directly caused by the kidnapping, not by some independent, unrelated and unforeseen act (*see* Tr. 2828).

Viewed in retrospect, the proofs at trial simply fall far short of establishing the key elements of the charges beyond a reasonable doubt. The government's proofs established nothing more than speculative hypotheses that Ouedraogo's association with Saba during the time of the underlying attempted financial fraud, which was directly attributed to only Saba, was in fact a conspiratorial endeavor between Saba and Ouedraogo.

### B. Impermissible Inferences

The deficiency in the government's proofs against Ouedraogo is best understood working backward, in keeping with the government's development of its conspiracy theory. As noted earlier in this opinion, this case evolved into a capital murder case against defendants Saba and Ouedraogo—despite some four weeks of trial, it remains a case in which there is no body, no weapon, no crime scene, no confession, and no physical evidence of a homicide or any other crime. That a death occurred at all must be inferred from disparate circumstances surrounding a disappearance. That the inferred death resulted from a kidnapping must be further inferred. That a kidnapping even occurred must be further yet inferred. It is on this foundation of inferences that still further, impermissible inferences are needed to link Ouedraogo to any of these inferred events, and to establish his complicity in a joint scheme to commit bank fraud. Considered individually, the legal requisite of *proof beyond a reasonable doubt* is not met for either kidnapping resulting in death or the conspiracy charges.

15

1.  *Kidnapping Resulting in Death*

The conclusion that Dietz died as a result of a kidnapping by Saba and Ouedraogo on September 12 or 13, 2007, cannot be reached based on the evidence presented and reasonable inferences therefrom.  It requires instead a stretch of pure speculation, which is impermissible for a criminal conviction.  Aside from the fundamental deficiency of proof of a kidnapping or death, even if these events took place, the proof of Ouedraogo's involvement is far too attenuated to sustain his conviction of crimes charged.  Further, for a conviction of kidnapping, the government must prove intent.  The government must prove, beyond a reasonable doubt, that Ouedraogo knowingly and willfully kidnapped, abducted, seized or confined Dietz.  There is no such proof.

The circumstances of the presumed death in this case are completely unknown.  There is no evidence of how, when or where the death occurred.  *The evidence is so lacking that at trial the government offered no specific theory, or even speculation, of how or where the death occurred.* As to when the death occurred, the government argued that Dietz died on September 12 or 13.  The date/time of death was based purely on piecemeal circumstances, stemming in large part from the inference that Ouedraogo was involved in the alleged crimes and because he was in Grand Rapids on those days.  That is, the government speculated that Dietz died on September 12 or 13 solely because Ouedraogo was in Grand Rapids on those days, and therefore those dates supported its conspiracy theory.  There is no evidence that Dietz was at his home on September 12 or 13 or, if he was elsewhere, where he was.

The Government argued that Dietz was dead before 1:47 p.m. on September 12, 2007, and more specifically that he died, as a result of defendants' kidnapping of him, between 9:43 a.m. and 1:47 p.m. (Tr 223, 2890).  The inferences necessary to reach this conclusion are unreasonable, and,

moreover, no evidence connects Ouedraogo to the government's scenario of a death at this time. The government's key proofs supporting a kidnapping and death at this time are, as Ouedraogo points out:

(1) Saba was stopped by police at 9:19 a.m. on September 12th, and he told police he had no proof of insurance, but the car was, in fact, insured;

(2) Saba called Ouedraogo from the area of 28th Street & Schaffer in Grand Rapids at 9:40 a.m.;

(3) there was no cell phone activity by Saba or Ouedraogo during those four hours; and

(4) Saba went with Ouedraogo to check into a different hotel on 28th Street in Grand Rapids at 1:47 p.m. (Dkt 650 at 49).

From this evidence, the government asked the jury to infer that Saba had a stun gun and pepper spray in the glove box of his car at the time of the traffic stop, that over the course of the next four hours, he picked up Ouedraogo, that the two of them kidnapped Dietz, who presumably was in Saranac, some 25 minutes away, the kidnapping resulted in Dietz' death, and then Saba drove Ouedraogo back to Grand Rapids, where he checked into a new hotel (Dkt 650 at 49-50; Dkt 671 at 33, 35).

The evidence shows nothing more than Ouedraogo's availability and *possible* presence with Saba.  The successive inferences required to conclude that Ouedraogo was involved in any kidnapping and death of Dietz during this time are simply not reasonable.  There is no evidence that Dietz was killed at his residence, and no evidence of a crime scene, no DNA and no fingerprints. As Ouedraogo argues, the government fits the facts to the theory instead of having the facts establish the theory.

The government's alternative theory that Dietz' kidnapping and death occurred on September 13th is equally tenuous. The government argues that evidence, including cell tower records, indicates that Ouedraogo was with Saba on September 13th when Saba's cell phone was "pinging" off a cell tower in the Saranac area and that Saba left Ouedraogo stranded in the Saranac area in the afternoon while Saba returned to his home in Lowell because his child was ill (Dkt 671 at 8, 35). The "evidence" that Ouedraogo was in the Saranac area is in fact nothing more than a far-too-distant inference grounded primarily in Saba's travel and phone records. The government relies on evidence that Saba left his home in Lowell around 9:15 a.m. (Ex. 134-B), calling Ouedraogo at 9:33 a.m. while en route to Ouedraogo's hotel, the Days Inn, in Grand Rapids; Ouedraogo checked out of the Days Inn at 11:23 a.m.; at 12:16 p.m., Saba called home, a one-minute call that "pinged" off the Saranac cell tower that covered an area within a half-mile of Dietz' trailer. At 2:42 p.m., Ouedraogo used his cell phone to call Saba. Despite the fact that there is no cell tower information or evidence of Ouedraogo's location at the time of his call, the government contends that the evidence establishes that Ouedraogo "was stranded in the Saranac area, and he was likely growing concerned about when Dr. Saba would pick him up" because he had a flight to Philadelphia leaving from Grand Rapids around 5:00 p.m. (Dkt 671 at 35). This conclusion is pure speculation, if not a flight of fancy based on absolutely no evidence.

Contrary to the government's argument, no reasonable inference can be drawn as to a kidnapping and death on September 13th on the basis of this meager, attenuated evidence, which shows nothing more than that Saba was likely in the Saranac area at 12:16 p.m. While the disconnected circumstances lend themselves to the government's speculative theory, they do nothing more than that. Absolutely nothing connects these time and location dots to a kidnapping and death.

18

Nothing.  Mere idle time and Saba's momentary cellular phone location near Saranac (an area through which a state highway runs from Grand Rapids) does not move the government theory of the date and time of death from speculation to a reasonable inference.  As Ouedraogo argues, the government again fits the facts to the theory instead of having the facts establish the theory.

The government relies on Ouedraogo's alleged false statement to investigators, that defendants stayed strictly in Grand Rapids, as bolstering the evidence of Ouedraogo's guilt because according to the government, the false statement was intended to hide his role in Dietz' kidnapping and death.  However, this adds little to the evidence.  First, that Ouedraogo's statement is false is not a foregone conclusion—without Ouedraogo's subjective geographical context, the accuracy or inaccuracy of this statement is unknown.  Second, there is no evidence that Ouedraogo was with Saba in Saranac; that is a conceivable but speculative inference advanced by the government.  Thus, while Saba may have been in Saranac, Ouedraogo may in fact have stayed strictly in Grand Rapids.

The evidentiary and inferential shortcomings of the government's date and time theories of Dietz' kidnapping and death become clear when viewed against an evidentiary record devoid of any corroborating circumstances.  Establishing a theory in a factual vacuum is a relatively easy but wholly unreliable means of obtaining a criminal conviction—and the law forbids it.[4]  As in *Newman*, 543 F.3d 793, the proofs fail:  there is no evidence of a crime scene, and no evidence placing

---

[4]Defendant aptly illustrates the government's circular reasoning: Ouedraogo's participation in the kidnapping and death is based on the government's argument that because of the timing of Dietz' disappearance and Ouedraogo's presence in Grand Rapids, Ouedraogo's participation could be inferred; but Ouedraogo's presence in Grand Rapids on September 12 and 13 is relevant only because the government argued that Dietz was killed in that time frame, and the main reason the government chose September 12 and 13 is because Ouedraogo was in town then; other than some missed phone calls at Dietz' residence, which was not uncommon, there is no evidence that Dietz went missing at that time (Dkt 650 at 53) (unless, of course, the government has evidence beyond that presented at trial).  Dietz was not even reported missing by his family until September 25.

Ouedraogo at Dietz' residence on September 12 or 13, 2007, or at any other time. The Court is persuaded that the evidence presented at trial, when assigned its proper evidentiary value rather than its theoretical appeal, is legally insufficient to support Ouedraogo's kidnapping *resulting in death* conviction.

Further, with regard to the proof of the elements of kidnapping, the Court agrees with Ouedraogo's assessment that there was insufficient evidence of the intent element with respect to Ouedraogo (Dkt 650 at 55). With only extremely weak circumstantial evidence of Ouedraogo's *possible* knowledge that Saba was interested in purchasing pepper spray and/or a stun gun, the jury was required to infer that Ouedraogo both knew of a plan to kidnap Dietz and that Ouedraogo intended to kidnap Dietz. The trial evidence is insufficient to support that conclusion.

The primary "evidence" relied on by the government to support the intent to kidnap, aside from the sheer number and alleged incriminating timing of defendants' frequent phone calls to each other,[5] are the inference that Ouedraogo knew of Saba's attempts to purchase and the purchase of a stun gun and two cans of pepper spray, and an inference that Ouedraogo knew that the purpose of the stun gun and pepper spray was to kidnap Dietz. These inferences are based on tenuous circumstantial evidence, but more importantly, first on further inferences drawn from that insubstantial evidence.

To reach the government's conclusion on the issue of intent, there must be an inference that Saba traveled to Ohio on July 25, 2007 to locate a company that sold stun guns and pepper spray,

---

[5]Given the history and nature of their close friendship, this evidence is of questionable inculpatory value. Saba's wife even testified that defendants were so close and talked so frequently on the phone with each other that they were like a married couple, and that from the time that she and Saba were dating and she met Ouedraogo, they had always been like that (Tr. 1060).

and an inference that Ouedraogo was with him, and an inference that the stun gun and pepper spray were for the purpose of incapacitating and kidnapping Dietz, and the further inference that Ouedraogo knew the specific purpose of Saba's trip and intended purchase.  All of these inferences are based mainly on facts that in and of themselves are incriminating only as to Saba, and are not the least bit incriminating as to Ouedraogo, including that (1) Saba was talking on the telephone with Ouedraogo on July 16, 2007 when Saba accessed the website for Aaron Imports; (2) Saba ordered two cans of pepper spray that day from a company in Texas, 27 minutes after talking with Ouedraogo on the telephone; (3) the July 25, 2007 trip to Ohio was immediately preceded and followed by Saba accessing the Ohio address for Aaron Imports; and (4) Saba ordered a stun gun on August 17, 2007.

The gaps between the limited circumstantial evidence and string of inferences necessary to show intent beyond a reasonable doubt cannot be filled by the miscellaneous "myriad evidence" (in the government's terms) of Ouedraogo's mere association with Saba, i.e., visits in 2007 and phone calls (*see* Dkt 671 at 46).  Nor are the gaps filled by what the government terms "dissembling" or alleged false exculpatory statements by Ouedraogo, alleged secrets from their spouses, and alleged motive and opportunity.  These surrounding circumstances give life to the government's theory only because of the government's selective and biased interpretation.  They do not suffice to cure the evidentiary and inferential shortcomings in the conviction of kidnapping.

Here as in *Newman*, there is neither direct nor circumstantial evidence placing Ouedraogo at a crime scene because there is no crime scene.  Reasonable doubt exists "because we are limited by what inferences reason will allow us to draw."  *Newman*, 543 F.3d at 797.  There is no evidence

placing Ouedraogo at the scene of any crime because no one knows where any crime occurred. There are no eye witnesses and no physical evidence of a crime.

Ouedraogo is entitled to a judgment of acquittal on the charge of kidnapping resulting in death and the lesser charge of kidnapping.

2. *Conspiracy to Commit Bank Fraud and Conspiracy to Commit Kidnapping*

As Ouedraogo contends, his convictions of conspiracy to commit bank fraud and conspiracy to commit kidnapping suffer from the same infirmities as the kidnapping resulting in death conviction. The government's case was built on insubstantial evidence and a multitude of seemingly plausible, but ultimately unreasonable, inferences. The government's case against Ouedraogo meets the definition of sophistry.

There is no dispute that Ouedraogo had a close association with Saba during the time frame covered by the alleged conspiracies, and for years before then, and that their association involved dozens of weekly phone calls and numerous visits during 2007. But this association, including their extensive phone calls, clearly was in place before the alleged conspiracies, and in and of itself, provides little more than a context for the government's theory of a conspiracy. Ouedraogo points out that the cell phone records established that defendants spent more time on the phone in June 2006 than any other month in 2007, except for September; and the total minutes in phone conversations in 2007, was not significantly different from in 2006 (Exs. QQQ, RRR, SSS). Saba's incriminating conduct cannot be attributed to Ouedraogo based merely on their close and frequent association.

The government has devoted much effort to piecing together a puzzle that cannot be made whole from the evidence and inferences reasonably drawn. There are simply too many missing

22

pieces, and the pieces that do fit together show little more than a landscape of Ouedraogo's association with Saba, but certainly no discernable participation by Ouedraogo in a conspiracy to commit either bank fraud or kidnapping.

The crime of conspiracy requires proof of the same degree of criminal intent required by the substantive offense. As discussed above, the government's proofs fall far short of establishing that Ouedraogo had the intent to kidnap Dietz, either directly or under a theory of aiding and abetting. The proofs are therefore insufficient for a conviction of Conspiracy to Commit Kidnapping, and Ouedraogo is entitled to a judgment of acquittal on this charge.

With regard to the charge of Conspiracy to Commit Bank Fraud, the government contends that both Saba and Ouedraogo knowingly and voluntarily joined in a conspiracy to commit bank fraud. To convict on this count, the government had to prove Ouedraogo conspired, or agreed, with Saba to commit the bank fraud, and that Ouedraogo knowingly and voluntarily joined the charged conspiracy, and acted with the same intent required to commit bank fraud. Thus, the government had to prove that Ouedraogo had the intent to defraud. The government also had to prove that Ouedraogo knowingly executed or attempted to execute a scheme to obtain money or other property owned by or in the control of a financial institution by means of false or fraudulent pretenses, representations or promises, and that the scheme included a material misrepresentation or concealment of a material fact.

The shortcoming of the proofs for the conspiracy to commit bank fraud is that the proofs are *all* about Saba—the record is devoid of any evidence of Ouedraogo's commission of any aspect of the bank fraud or of his participation or involvement with Saba's actions in this regard. In addition to the telephone calls and travel evidence, which as previously discussed can only remotely and

inferentially even be considered incriminating, the government cites evidence of Saba's alleged written third-person statement that, according to Saba's fellow jail inmate, Franklin Ash, discussed a purported financial fraud and kidnapping scheme, and referred to a "partner." The government relies on this reference as circumstantial evidence that identifies Ouedraogo as Saba's partner in the charged crimes. However, even crediting Franklin Ash's testimony in the light favoring the verdict, *see Alvarez,* 266 F.3d at 596, the reference to a partner was merely a general reference and did not identify Ouedraogo in any manner. This bare reference in the written statement is insufficient to establish Ouedraogo's guilt on the specific elements of the conspiracy at issue, particularly since, as discussed subsequently, the statement was written in the third person, not as a statement of Saba himself.

With regard to the bank fraud charges, the government relies in particular on evidence of Saba's repeated use of the Tracfone to carry out the financial fraud scheme and cover up Dietz' disappearance, as implicating Ouedraogo. The Court agrees with the government that the evidence linking Saba to the Tracfone is "manifest," but disagrees that Saba's use of the Tracfone, coupled with the timing and pattern of calls with Ouedraogo, is "compelling" evidence linking Ouedraogo to the use of the Tracfone (*see* Dkt 671 at 15). Given defendants' undisputed close relationship and frequency of their calls, nothing incriminating can reasonably be inferred from the mere timing and pattern of calls with Ouedraogo over the course of Saba's use of the Tracfone.

Likewise, the government reads much into the SIM card Saba gave Ouedraogo during his September 2007 visit as constituting incriminating evidence of the financial fraud conspiracy—a tool to carry out the scheme. The government asserts that Ouedraogo falsely claimed the purpose of the SIM card was to save money on his cellular phone bills, when in fact his monthly phone bills

24

do not reflect any savings.  However, the government's reasoning is flawed—not only is there an alternate explanation for Ouedraogo's continuing monthly phone costs, which included some one-time charges for a new phone/line, but also the government's argument ignores that Ouedraogo's stated concern was usage charges for excessive minutes, and use of the SIM card may have avoided additional usage charges, thereby achieving a net cost-savings whether the monthly bill was reduced or not (*see* Dkt 688, n.1).

Similarly, the government emphasizes Ouedraogo's trip to Brooklyn on September 27, 2007 as specific evidence that he was involved in the financial fraud scheme given the timing and details of defendants' activities and given that Saba used a forged Brooklyn notarization in the letter to Lake Michigan Credit Union in the attempted transfer of Dietz' funds to Lebanon.  The government emphasizes that Ouedraogo was calling Saba during this trip and his cell phone was pinging off a tower with coverage within one block of the Brooklyn notary's bookstore.  The import of this evidence is based solely on the government's interpretation of selected facts to fit its theory and, as Ouedraogo points out, ignores the significant evidence that Ouedraogo called Saba with the SIM card using the Brooklyn cell towers on September 16, 2007, *before* the Credit Union informed Saba that a notarized letter was required to transfer funds to Lebanon (*see* Dkt 688, n.1, citing Ex. 134-C). Further, the government's interpretation of the Brooklyn trip ignores that (1) Ouedraogo previously lived and worked in that area of Brooklyn, (2) the Brooklyn notary testified that she had never seen Ouedraogo, and (3) the forensic computer evidence of the forged Brooklyn notarization directly points to Saba, not to Ouedraogo.

The government's portrayal of the Tracfone, SIM and Brooklyn trip evidence illustrates the government's repeated over-reaching on the factual record.  The same is true of the evidence of

Saba's jail telephone call to Ouedraogo after he was arrested and Saba's life insurance policy beneficiary assignments on his life insurance policy.  This evidence is far too weak to support inferences that Ouedraogo knowingly and voluntarily joined in a conspiracy to commit bank fraud and had the intent to defraud.  It is only as a result of the government's contrived interpretation of the circumstantial evidence that any evidence of Ouedraogo's involvement in a conspiracy to commit bank fraud exists.

Now that the dust of trial has settled, and the copious but often unrelated factual evidence is examined for the reasonable inferences it supports, the Court concludes that no rational trier of fact could find that the government proved the requisite elements of conspiracy to commit bank fraud *beyond a reasonable doubt*.  Ouedraogo's conviction rests on insufficient evidence of his guilt, or indeed his involvement, and the Court therefore grants Ouedraogo's motion for judgment of acquittal.

## C.  Post-trial Conclusion

In the end, the government's case against Ouedraogo was the same as it was in the beginning, nothing more than theory.  The government's allegations in the Second Superseding Indictment, detailing the basis of Ouedraogo's complicit role in the financial scheme proved to be based on mere suppositions and interpolations from the slim facts and innocuous circumstances.  For instance, the government alleged that Ouedraogo was experiencing significant stress during 2007 because of his poor financial situation (Sec. Super. Indict. ¶ 8)—yet his financial situation was shown to be no different than that of many working Americans, and the government conceded in opening statement that "Ouedraogo's financial situation wasn't desperate" (Tr. 220; see also Tr. 2846).  The allegation that Ouedraogo made at least three trips to Grand Rapids, including a 48-hour

trip during the time Dietz was believed to have disappeared, September 11-13 (Sec. Super. Indict. ¶ 9): this is circular reasoning resulting from the government merely chasing its own theory (*see* n.4, infra).   Allegations that Ouedraogo could not account for his whereabouts from 11:23 p.m. on September 11 when he arrived in Grand Rapids to 1:45 p.m. the next day, that he gave conflicting accounts to investigators, that defendants lied to their respective spouses about their whereabouts and activities, and that Saba gave Ouedraogo a SIM card although Ouedraogo had his own cell phone (*id.* ¶¶ 9, 13)—all shown to be exaggerated inferences, either unsupported by the evidence or of no direct significance in light of the evidence overall.   In the end, the government's allegations were not proved at trial, and its theories remain simply theories.

## V.  NEW TRIAL MOTION

Ouedraogo moves in the alternative for a new trial on three separate grounds:  (1) the verdict is against the great weight of the evidence; (2) improper admission of Ash's testimony concerning alleged statements by Saba; and (3) prosecutorial misconduct in closing rebuttal argument. Although the Court has determined above that a judgment of acquittal must be entered on all three counts of conviction, the Court must conditionally rule on the motion for new trial.  *See* FED. R CRIM P. 29(d)(1).

Having presided over lengthy trials in this case, not once, but twice, it is the Court's firm view that the interest of justice requires that the Judgment in this case be vacated and a new trial be granted should this Court's post-verdict judgment of acquittal not be upheld on appeal.  While the Court finds some merit in Ouedraogo's challenge to the prosecutor's rebuttal argument, it does not meet the associated standards justifying a new trial.  However, the Court is persuaded that a new trial is required on the basis of the two remaining challenges in that the verdict is against the great

27

weight of the evidence and this finding is compounded by the erroneous admission of Ash's testimony of a writing interpreted as a quasi-confession of guilt by Saba that implicated a partner in the crimes charged, inferred to be a reference to Ouedraogo.

### A.  Great Weight of the Evidence

In simple terms, this case became a parochial-high-profile murder mystery.  To believe that a reclusive, but fairly well-known man could be killed in his own small community, and his body disposed of, without a trace of evidence, is difficult to fathom.  In retrospect, the Court is convinced that the persuasive appeal of the government's case to the jury rested more on offering a "mystery-solved" ending to this story than on a legal showing of guilt *beyond a reasonable doubt* based on the evidence.

For the reasons already discussed with respect to the motion for judgment of acquittal, the jury's verdict was against the great weight of the evidence.  The evidence presented did not establish Ouedraogo's guilt of any of the charged offenses and, ultimately showed little more than Ouedraogo's close association with Saba and his presence at the time the crimes were alleged to have occurred.  The only distinction in this Court's consideration of the motion for judgment of acquittal and the motion for new trial is the credibility of a single witness—Franklin Ash.  The Court may weigh credibility in deciding whether to grant a new trial.  *Hughes,* 505 F.3d at 593.  As discussed subsequently, the Court finds Franklin Ash's testimony wholly incredible and discounts his testimony in its entirety.  Ash's testimony was the sole totally incredulous link presented between Ouedraogo and the scheme to fraudulently obtain Dietz' money.  Without that link, the government's case is nothing more than speculation built on innocuous facts, and Ouedraogo is entitled to be tried anew.

28

### B.  Franklin Ash Testimony

Ouedraogo argues that the Court erred in ruling that Franklin Ash's testimony was admissible as a statement against penal interest pursuant to Federal Rule of Evidence 804(b)(3).  Ash testified that while he was an inmate at the Ionia County jail with Saba, he was privy to a handwritten statement by Saba that discussed *in the third person*, and in part hypothetically, events related to Dietz' kidnapping and death and the underlying financial fraud, including a reference to a "partner" in the scheme.  Ash testified that he read several pages of the 15-20-page writing and advised Saba to dispose of the writing by flushing it down the toilet, which Saba did, according to Ash.[6]   In retrospect, the Court is persuaded that application of the legal standards to the circumstances at issue did not adequately support admission of this hearsay testimony.

Rule 804(b)(3) provides a hearsay exception for a statement that "a reasonable person in the declarant's position would have made only if the person believed it to be true because, when made, it . . . had so great a tendency . . . . to expose the declarant to civil or criminal liability."

The Sixth Circuit has declined to find that Rule 804(b)(3) is a "firmly rooted hearsay exception."  *United States v. Franklin,* 415 F.3d. 537, 547 (6th Cir. 2005).  For a statement to qualify under Rule 804(b)(3), three requirements must be met:

> (1)      the declarant must be unavailable; (Given Saba's refusal to testify after being given formal immunity, the parties do not dispute that this requirement is met, *see* Rule 804(a)(2).)
>
> (2)      the statement must, from the perspective of the average, reasonable person, truly be adverse to the declarant's penal interest; and

---

[6]It is questionable whether Saba actually could or did achieve this alleged disposal since there is no evidence that Ash witnessed Saba flush the statement down the toilet (*see* Tr. 2302).

(3)  corroborating circumstances must truly establish the trustworthiness of the statement.

*United States v. Johnson,* 581 F.3d 320, 326 (6th Cir. 2009); *United States v. Tocco,* 200 F.3d 401, 414 (6th Cir. 2000).

At the time the Court was presented with the question of the admissibility of Ash's testimony, it was a relatively small part of the government's overall efforts to seek the trial testimony of various fellow inmates concerning statements by Saba in 2009 while held in the Ionia County jail on perjury charges in conjunction with the state's investigation of this case.[7]  The question of the admissibility of several jail inmates' testimony, raised in a pretrial motion by defendant (Dkt 367), was necessarily held until trial for decision given the uncertainty whether Saba himself would testify, thereby mooting the motion.  Saba ultimately refused to testify at Ouedraogo's trial, necessitating a ruling by the Court midtrial (Tr. 2279).

Although the government initially sought the testimony of one named witness, Brady Wood, as well as several "John Doe" inmates, the government ultimately sought the admission of testimony from only two jail inmate witnesses: Wood, an informant who solicited contact with investigators, and whom the FBI "wired" to record his conversations with Saba; and Franklin Ash.

The question of admissibility of the inmates' testimony hinged on whether the statements were against Saba's penal interest and whether the statements were trustworthy (Tr. 2280-81).  The topics at issue were (1) the scheme did not go as planned; (2) reference to a partner; (3) disposal of a body, and (4) a white cargo van, which Ash interpreted, was used to transport the body (Tr. 2281-83, 2306).

---

[7]The state charges were ultimately dismissed in lieu of the federal prosecution of the death-penalty-eligible offenses.

After hearing an abbreviated version of Ash's testimony, the Court ruled that two lines of testimony were admissible: (1) the existence of a plan and that it went too far; and (2) the involvement of a partner, including calling a partner after checks he deposited bounced because he was scared he would get caught (Tr. 2360-62).  However, the Court ruled that Ash's testimony concerning disposal of a body was inadmissible because it was more of an academic discussion and did not meet the penal-interest prong of the *Johnson* test for admissibility (*id.* at 2262).  The Court also heard testimony from Brady Wood, whose testimony the Court ruled was inadmissible.  With regard to Wood, the Court found there was a complete dearth of corroboration for purposes of Rule 804(b)(3) to fit within the exception to the hearsay rule (Tr. 2359).  The Court found that Wood clearly had no memory of the statements and nothing indicated that he reached a level of friendship with Saba over just a few days to establish the trustworthiness of his testimony (Tr. 2360).

Having fully reconsidered the issue of Ash's testimony based on the arguments now before the Court, the Court is persuaded that it did not meet the *Johnson* test for a hearsay exception, in that corroborating circumstances did not exist to establish the trustworthiness of the statement.  Further, the third-person, hypothetical context of the statement raises serious questions whether Saba believed this statement to be against his penal interest.

In *Johnson*, the Sixth Circuit considered the statements of an inmate, Baron Nix-Bey, who reported that Johnson's coconspirator in the robbery of an armored truck in Dearborn, Michigan, Timothy O'Reilly, had made incriminating statements to Nix-Bey.  *Johnson,* 581 F.3d at 323.  The court found no error in the admission of a tape-recording of O'Reilly's statements to Nix-Bey.

The court explained that "[t]he third prong of Rule 804(b)(3)'s trustworthiness analysis requires us to focus not 'on whether other evidence in the case corroborates what the statement

31

asserts, but rather on whether there are corroborating circumstances which clearly indicate the trustworthiness of the statement itself.'" *Johnson,* 581 F.3d at 327 (citing *United States v. Franklin,* 415 F.3d 537, 547 (6th Cir. 2005). The *Johnson* court relied on the following circumstances in finding the statements trustworthy:

1.  since the jury heard a recording, there was no risk that the statements were inaccurately relayed to the jury;

2.  "O'Reilly and Nix-Bey were friends and confidants, as evidenced by testimony from Nix-Bey that even before the two of them became cell-mates, they saw each other every day at meals, engaged in numerous social activities together, and worked together on O'Reilly's legal matters.

3.  "O'Reilly was unaware that he was being recorded and therefore could not have made his statement in order to obtain a benefit from law enforcement" (citing *Williamson v. United States,* 512 U.S. 594, 603 (1994)).

4.  "O'Reilly's unflattering references to Johnson as 'expendable' and a 'dumb-ass' also suggest that he was not attempting to shift blame to Johnson."

*Johnson,* 581 F. 3d at 327; *see also United States v. Price,* 134 F.3d 340, 348 (6th Cir. 1998) (relying on some of the same factors and further noting that the evidence at trial independently corroborated a number of parts of the statement).

Evaluating the above factors, the Court concludes that the circumstances surrounding Ash's testimony of the alleged statement by Saba did not establish its trustworthiness. Ash was seemingly forthright in his preliminary testimony, but there is little question that his testimony was designed to meet his own purposes, i.e., to complete his obligation to testify with minimal commitment and

repercussions, and that his testimony likely was preordained from his grand jury testimony, as the defense argues. Once he testified before the grand jury, in an effort to receive beneficial treatment in his own criminal case, Ash was "locked into" his testimony.

In admitting Ash's testimony, this Court relied in part on his preliminary testimony that he had become Saba's confidant. However, Ash's relationship with Saba was inconsistent, beginning as a tormentor of Saba and ending at complete odds with Saba due to alleged threats of harm by Saba. It is unlikely that any bond ever existed between Ash and Saba to the extent that Saba would share with Ash a 15-20 page writing detailing a financial fraud scheme and the alleged kidnapping and death.

Following Ash's testimony outside the presence of the jury, to decide the preliminary question of admissibility, the Court twice heard Ash's trial testimony, first in Ouedraogo's trial, then in Saba's trial. It became patently clear to the Court after his successive trial testimony that Ash's testimony concerning the alleged handwritten statement by Saba is not creditworthy in any respect and is entitled to absolutely no weight in this case. Ash's testimony was inconsistent and unreliable. A review of the transcript of even his preliminary testimony reflects these inconsistencies. For example, at one point, in response to the prosecutor's questioning, Ash expressly clarifies that Saba's statement said nothing about the partner being Saba's friend (Tr. 2307). But Ash subsequently testified that Saba called his "friend/partner" when he was scared about getting caught because of the check bouncing (Tr. 2311), and on cross-examination, testified that the writing "never said my partner, it was more along the lines of we, us, kind of thing" (Tr. 2319). Ash also testified that the statement made reference to "his partner or his people" and that it was Ash's assumption that the partner was a Lebanese person and it was his personal belief that Ouedraogo had nothing to do with

33

the scheme described (Tr. 2306-09). It is now clear that Ash's testimony regarding what he read in Saba's statement is tainted by what he gleaned from other sources, including newspaper accounts, the second superseding indictment, Saba's court documents, underlying police reports, and other sources (Tr. 2317).

Other than his alleged, but highly suspect, status as Saba's confidant at the time Ash found the alleged written statement by Saba, there is nothing to support the trustworthiness of Ash's hearsay testimony. Unlike in *Johnson*, there is no recording to assure the accuracy of Ash's recollection of the contents of the statement, and his trial testimony proved to be confusing and muddled given his various sources of information about Saba's case. Moreover, as Ouedraogo now points out, Ash admittedly read only the first several pages of the 15-20 page writing, further calling into question the accuracy and completeness of his hearsay testimony as to its contents.

The Court is persuaded that the admission of Ash's testimony was improper and warrants a new trial. Further, as Ouedraogo points out, the government persisted in mischaracterizing the alleged writing as a statement of Saba's own wrongdoing, which it was not. The writing was not a statement of anything Saba himself did nor did it even identify Saba (Tr. 2316). But throughout Ash's testimony and in argument, the government ignored that the alleged writing was in the third person ("he," not "I"), and instead attributed all the actions to Saba as though the statement was a confession. Additionally, the government then relied on its faulty characterization to implicate Ouedraogo based on the statement's reference to a "partner" and calls made after the checks bounced. The government's subtle but persistent transformation of the third person in the written statement to Saba himself, prejudicially elevated this evidence to an inaccurate and improper status. This transformation escaped clarification for the benefit of the jurors and the effect, if any, in the minds

of the jurors is unknown.  If Ash's testimony was credited by even a single juror, in part or in whole, the verdict convicting Ouedraogo is undermined.

### C.  Prosecutorial Misconduct

Ouedraogo seeks a new trial on the grounds that several aspects of the government's rebuttal closing argument were flagrant acts of misconduct warranting a mistrial.  Ouedraogo complains that the entire theme of the rebuttal was that the defense case was "smoke and mirrors"; the government's argument was derogatory to the defense and insinuated to jurors that they would be denying their civic duty by finding Ouedraogo not guilty; the government suggested the defense was distorting the legal standard regarding the burden of proof; and the government repeatedly misstated various facts (Dkt 650 at 72-74).  Defense counsel objected at a sidebar to the government's misstatement that Ouedraogo did not produce certain documents for the grand jury, which resulted in a caution from the Court and a clarification by the government (Tr. 2945-46).

Ouedraogo's prosecutorial misconduct argument fails for two reasons.  First, Ouedraogo failed to specifically object at trial on the grounds now raised in challenging the prosecutor's rebuttal argument.  Second, although the prosecutor's rebuttal arguably bordered on improper civic-duty argument, any impropriety could have been cured by an instruction.  Any challenged argument was not flagrant and prejudicial so as to warrant a new trial.  *See Hargrove,* 416 F.3d at 492-93.

### VI.  Conclusion

This case has presented unique challenges at almost every step along the course, not the least of which is evaluating defendants' participation in a scheme leading to Donald Dietz' disappearance and death, on the basis of the circumstantial proofs.  But it is not the Court's obligation to determine Ouedraogo's guilt or innocence.  The Court's role is only to evaluate whether the government's

proofs have established *beyond a reasonable doubt* every legal element of the crimes charged. On the proofs, as presented by the government, the evidence does not permit the conclusion that a rational jury could find Ouedraogo guilty *beyond a reasonable doubt*.

By any account, the proofs at trial leave all the critical questions unanswered. In the end, it is the government, rather than the defense, that has created a case against Ouedraogo using "smoke and mirrors." The government's case lacked focus and cohesion. The government's endless drum-beating that their very slim facts establish reasonable inferences that inevitably lead to a guilty verdict was nothing more than repetition of a series of surmises, which the government tried to transform into facts. In this case, the government settled on an unswerving adoption of a version of its case, to wit, that Saba and Ouedraogo kidnapped and killed Dietz, and the government's unwavering belief in that scenario prevented any alternatives in spite of a lack of evidence to support it.

In light of the well-established legal standards for sufficiency of the evidence to sustain a criminal conviction, Ouedraogo's motion for judgment of acquittal must be granted. Likewise, in the alternative, the Court conditionally grants his motion for a new trial for the reasons stated, should the judgment of acquittal now rendered be later vacated or reversed.


DATED: December 21, 2011                    /s/ Janet T. Neff_____
                                            JANET T. NEFF
                                            United States District Judge